## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Oct 14 2015, 8:40 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

William W. Gooden
Mt. Vernon, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Noah Shane Warren,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

October 14, 2015

Court of Appeals Case No.
63A01-1503-PC-103

Appeal from the Pike Circuit Court

The Honorable Jeffrey L. Biesterveld, Judge

Trial Court Cause No.
63C01-1309-PC-395

**Kirsch, Judge.**

[1]     Noah Shane Warren ("Warren") appeals the post-conviction court's denial of his petition for post-conviction relief contending that his trial counsel was

ineffective for failing to object at trial to evidence obtained pursuant to a search warrant.

[2] We affirm.

## Facts and Procedural History

[3] The facts supporting Warren's convictions as set forth by this court in an unpublished decision on his direct appeal are as follows:

> On October 16, 2010, Warren's two daughters, ten-year-old K.W. and fourteen-year-old C.W., were staying at his home in Pike County. That day, two of Warren's friends, Marty and Audrey, arrived at Warren's house in their red Chevy Blazer. Marty and Audrey went into Warren's bedroom with him and closed the door. Later, Marty, Audrey, Warren, and Warren's two daughters left the house in the red Blazer. They first went to the home of Jerry, one of Warren and Marty's friends. Only Warren and Marty went inside; when they came back outside, they were carrying a bag. They next went to Oakland City where they dropped Marty off at a hardware store while everyone else went to an automotive supply store. When Marty returned to the car from the hardware store, he was carrying a brown bag. The last stop made was at the home of someone named Clint. Only Marty went inside. After leaving Clint's house, they all went back to Warren's house.
>
> When they arrived at Warren's house, Marty took all the items that they had obtained into the bathroom and Warren began heating a clear liquid in a container in the kitchen. C.W. was in the kitchen, and K.W. was going back and forth between the living room and kitchen, which were connected. C.W. heard Marty tell Warren, "don't do that. It might blow up." *Tr.* at 398. Warren responded, "I've done this before." *Id.* at 408. After

hearing this, C.W. decided to leave the house, fearing that "something bad [was] going to happen." *Id.* at 398. She went to the house of her grandparents, Terry and Phyllis Warren, who lived on the same property but across a field from Warren. C.W. tried to convince K.W. to come with her, but K.W. did not want to leave. As C.W. left, Warren told her that she better not tell her grandparents that Marty and Audrey were at the house; Terry and Marty "didn't really get along." *Id.* at 437.

When C.W. got to her grandparents' house, Phyllis asked if anyone was at Warren's house. C.W. lied and said no. Terry then asked her the same question and C.W. lied again. Meanwhile, Terry's nephew, Daniel Warren, had been setting up a tree stand in the woods with his cousin, Ben Harris. Jamie Warren, who also lived on the property with his father, Jerry, went to Daniel and told him that Terry needed help. Daniel went to the house to help, thinking that Terry was hurt. Instead, Jerry told Daniel that Terry wanted help "trying to run some people off [Warren's property] that [Terry] didn't want up there." *Id.* at 289.

Daniel drove his truck over to Warren's house and noticed a strong chemical odor that smelled like ether. He was concerned that methamphetamine was being made and that the house might blow up. He was also concerned that his nieces might be in danger as a result of the chemicals. Ben also arrived at Warren's house, and Daniel told Ben to back Daniel's truck away from the house in case it blew up. Daniel then went up to the house and knocked on the door but no one answered. As Daniel started to walk away from the house, he saw Terry walking toward the house. Terry told Daniel he did not think anyone was home and that he thought he had run them off. Daniel noted that the red Blazer was still there.

Daniel called Warren and found out that K.W. was still inside the house. Daniel told Warren to let her out, but Warren

responded that "there was nothing going on and [Daniel] was effing crazy." *Id.* at 296. K.W. heard Daniel yelling for her from outside, but since she had not seen him for a long time, she did not recognize him and did not leave the house.

Daniel walked closer to the house and pretended like he was calling the police, but he did not call immediately because he did not want to get Warren in trouble. From inside the house, Warren told Daniel, "if I go to jail, I'm going to kick your ass." *Id.* at 297. Warren then came out of the house and got in Daniel's face. The two started fighting and Daniel hit Warren several times.

Meanwhile, Terry and Phyllis arrived at Warren's house. When Warren went back inside, Phyllis followed him in and they began to argue, too. Phyllis tried to get into the bathroom where Marty and Audrey were. Marty and Audrey "said they were having sex in there," *id.* at 301, but Phyllis could hear the toilet flushing "quite a few times." *Id.* Phyllis went back outside, and Warren followed, carrying a butcher block of knives. Warren began to throw the knives at Daniel, telling Daniel to get away from his house. Ben then told Daniel if Daniel was not going to call the police, he would. Daniel called the police and his 911 call was recorded. He told the dispatcher that he was trying to "get the kid out of the house." *Id.* at 308. He said that a Chevy Blazer had just left the house, and then went on to say, "I just don't want that little girl to get hurt. The house could blow up." *Id.* at 311. Daniel then handed the phone to Phyllis, who had the following conversation with the dispatcher:

Dispatcher: Has he made any threats?

Phyllis: Excuse me?

D: Has he threatened?

P: He has just, he has just yelled a lot.

D: Okay. He hasn't, he hasn't made, he hasn't made any threats on his own life or his daughter's life?

P: No. No. No. Not, not so ever.

*Id.* at 313. While Daniel and Phyllis were on the 911 call, Marty and Audrey left Warren's house carrying a bag of items.

About the same time, Terry also called the police. He told the dispatcher, "I want to report a radical driver. I think they're on dope and stuff. And they're driving crazy." *Id.* at 315. He also told the dispatcher that the red Blazer "just went down Oatsville Road toward 57." *Id.* Warren then started removing items from the house, throwing some into the tree line next to the house. He also brought out a trash bag full of items, dumped them into the burn pile, and tried to light them on fire, but they would not light. Police officers also began to arrive, and as all of the officers approached the house, they smelled the strong smell of ether, which appeared to be coming from inside the house. *Id.* at 510, 591, 646.

Pike County Sheriff's Department Deputy Brad Jenkins was the lead investigator at the scene. Conservation Officer Duane Englert walked around the house and saw K.W. inside. Officer Englert went to the door and Warren met him there. Officer Englert told Warren that he needed to come outside so that they could talk. When Warren came outside, Officer Englert handcuffed him and escorted him away from the house. Officer Englert stayed with Warren while the other officers on the scene cleared the house, obtained a search warrant, and searched the house and the tree line. Warren told Officer Englert that he had been cleaning up and getting rid of some things in the house and had taken a shoe box to the tree line to get rid of it. *Id.* at 518.

Warren said that one of the items inside the shoe box was a bloody sock because he had cut himself while he was cleaning up. *Id.* Warren also said that he had started cleaning up when he found out that the police were coming to his house. *Id.* at 521-22. During the conversation, Officer Englert noticed that Warren was "somewhat over excited," so he asked Warren about his methamphetamine use. *Id.* at 544-45. Warren said that he had used methamphetamine two days ago, but he had purchased it and not made it himself. Officer Jenkins asked Officer Englert to conduct a taped interview with Warren. Officer Englert advised Warren of his *Miranda* rights and asked him to give a taped statement. Warren then began recanting his story and gave a different statement than he had a few minutes before when he was speaking to Officer Englert and not being taped. *Id.* at 522. Officer Englert stopped the recording.

Meanwhile, the other officers who had obtained a search warrant were searching Warren's home. They found lithium batteries, two pairs of scissors, an empty prescription bottle that had previously held 90 pills and was prescribed only four days earlier, a manipulated light bulb and foil that could be used to smoke methamphetamine, and a plate with a white residue on it. *Id.* at 570, 619-24, 631, 678-81.

Officer Englert searched outside and found the burn pile and a white trash bag that was partially open. Inside the trash bag were burned aerosol cans. *Id.* at 532. In the burn pile were the outer cases of batteries. *Id.* at 665. Terry and Daniel directed officers to the tree line where Warren had thrown some items, and officers found the box containing Warren's bloody sock, along with a cold pack, a plastic ketchup bottle with white residue inside, and burnt cans with holes in the bottom. *Id.* at 369, 650.

William Bowles, a forensic scientist, examined some of the items that were found at Warren's house. The white residue inside the

ketchup bottle was not methamphetamine, ephedrine, or pseudoephedrine. *Id.* at 569-70. The plate with white residue on it was washed with chloroform, and Bowles determined that it contained either ephedrine or pseudoephedrine, precursors for manufacturing methamphetamine. *Id.* at 570-71. At trial, Bowles testified that simply putting pills that contained ephedrine or pseudoephedrine on the plate would most likely not leave that type of residue, but it was not impossible; it was much more likely for the residue to be left if the pills were crushed up. *Id.* at 581.

The State charged Warren with Class B felony dealing in methamphetamine, Class D felony maintaining a common nuisance, Class D felony possession of two or more precursors, Class D felony neglect of a dependent, Class D felony possession of methamphetamine, and Class A misdemeanor possession of paraphernalia. The State later moved to amend the charging information and add a habitual substance offender enhancement. The trial court granted the motion. The State then moved to dismiss the Class D felony possession of methamphetamine charge.

A jury trial was held in February 2012. At trial, the trial court admitted a cold pack that listed ammonium nitrate as an ingredient on its labeling information into evidence over Warren's hearsay objection. The trial court also admitted the audio recording of Terry's 911 call into evidence over Warren's objection, finding that the State had laid a proper foundation. The jury found Warren guilty on all counts, and Warren pled guilty to the habitual-offender enhancement. At the sentencing hearing, the trial court imposed a sentence of twelve years for dealing in methamphetamine, two years for maintaining a common nuisance, two years for possession of two or more precursors, one year for possession of paraphernalia, and two years for neglect of a dependent, all to be served concurrently. This twelve-year sentence was enhanced by four years based

upon the habitual-offender enhancement, for an aggregate
sentence of sixteen years.

*Warren v. State*, No. 63A01-1204-CR-165, at *1-4 (Ind. Ct. App. Jan. 30,
2013) *trans. denied*.

[4] After his conviction, Warren filed a direct appeal, and a panel of this court
affirmed in part and reversed in part, reversing his conviction of maintaining a
common nuisance. *Id.* Appellate counsel, in the direct appeal, did not raise an
issue regarding Warren's motion to suppress or allege that trial counsel, Marcus
M. Burgher ("trial counsel"), was ineffective.

[5] On September 5, 2006, Warren filed a *pro se* petition for post-conviction relief.
Prior to any rulings on that petition, on October 4, 2013, appellate counsel filed
his appearance on Warren's behalf. On April 8, 2014, Warren's counsel filed
an amended petition for post-conviction relief claiming ineffective assistance of
trial counsel. In lieu of a hearing, Warren requested that the trial court take
judicial notice of the search warrant, affidavit of probable cause, and the trial
record. Following the submission of findings of fact and conclusions thereon
by the parties, the court denied Warren's petition for relief on February 17,
2015. Warren now appeals.

## Discussion and Decision

[6] Post-conviction proceedings do not afford the petitioner an opportunity for a
super appeal, but rather, provide the opportunity to raise issues that were
unknown or unavailable at the time of the original trial or the direct appeal.

*Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000), *cert. denied*, 534 U.S. 1164 (2002); *Wieland v. State*, 848 N.E.2d 679, 681 (Ind. Ct. App. 2006), *trans. denied*, *cert. denied*, 549 U.S. 1038 (2006). The proceedings do not substitute for a direct appeal and provide only a narrow remedy for subsequent collateral challenges to convictions. *Ben-Yisrayl,* 738 N.E.2d at 258. The petitioner for post-conviction relief bears the burden of proving the grounds by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5).

[7] When a petitioner appeals a denial of post-conviction relief, he appeals a negative judgment. *Fisher v. State,* 878 N.E.2d 457, 463 (Ind. Ct. App. 2007), *trans. denied.* The petitioner must establish that the evidence as a whole unmistakably and unerringly leads to a conclusion contrary to that of the post-conviction court. *Id.* We will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Wright v. State,* 881 N.E.2d 1018, 1022 (Ind. Ct. App. 2008), *trans. denied.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Lindsey v. State,* 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), *trans. denied.* We accept the post-conviction court's findings of fact unless they are clearly erroneous, and no deference is given to its conclusions of law. *Fisher,* 878 N.E.2d at 463.

[8] When evaluating a claim of ineffective assistance of counsel, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Perry v. State*, 904 N.E.2d 302, 308 (Ind. Ct. App. 2009) (citing *Pinkins v. State*, 799

N.E.2d 1079, 1093 (Ind. Ct. App. 2003), *trans. denied* ), *trans. denied*. First, the defendant must show that counsel's performance was deficient. *Id*. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth and Fourteenth Amendments. *Id*. Second, the defendant must show that the deficient performance resulted in prejudice. *Id*. To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. In order to prove ineffective assistance of counsel due to the failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure. *Kubsch v. State*, 934 N.E.2d 1138, 1150 (Ind. 2010).

[9] Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Williams v. State*, 711 N.E.2d 70, 73 (Ind. 2002). We will not lightly speculate as to what may or may not have been an advantageous trial strategy, as counsel should be given deference in choosing a trial strategy that, at the time and under the circumstances, seems best. *Perry*, 904 N.E.2d at 308 (citing *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998)). Isolated omissions or errors, poor strategy, or bad tactics do not necessarily render representation ineffective. *Shanabarger v. State*, 846 N.E.2d 702, 708 (Ind. Ct. App. 2006), *trans. denied*. The two prongs

of the *Strickland* test are separate and independent inquiries. *Manzano v. State*, 12 N.E.3d 321, 325 (Ind. Ct. App. 2014), *trans. denied*, *cert. denied*, 135 S. Ct. 2376 (2015). Therefore, "if it is easier to dispose of an ineffectiveness claim on one of the grounds instead of the other, that course should be followed." *Talley v. State*, 736 N.E.2d 766, 769 (Ind. Ct. App. 2000).

[10] Warren claims that his trial counsel was ineffective for failing to make contemporaneous objections to the State's exhibits that were obtained pursuant to search warrant when they were offered for admission at trial. Warren further contends that trial counsel's performance was deficient because he failed to specifically ask for a continuing objection. Warren believes that he was prejudiced because there is a "reasonable probability that such [objections] would have been sustained either at trial or on appeal which would have, in turn, resulted in the lack of sufficient evidence to convict [him]." *Appellant's Br.* at 6. As a result of these alleged deficiencies, Warren argues that trial counsel "waived both a ruling by the trial court on admissibility and an appeal of that issue." *Appellant's Br.* at 9. We do not agree.

[11] At the post-conviction hearing, the following evidence was presented: Warren's trial counsel filed a motion to suppress evidence, for which an evidentiary hearing was held on September 27, 2011. The court denied the motion to suppress after testimony was taken, and the parties briefed the issues. On the first day of trial, February 1, 2012, before any evidence was presented, trial counsel prompted a discussion with the trial court and the State as to when the best time would be to allow Warren's counsel to preserve his objection to the

disputed evidence. The following morning before Deputy Jenkins testified, trial counsel renewed his motion to suppress, incorporating his prior arguments in addition to making new arguments. Warren's counsel was given the opportunity to make an offer of proof, and the trial court acknowledged that counsel was doing so to "protect [his] record." *Trial Tr.* at 255. After reviewing the file, the trial court, once again, denied Warren's motion to suppress.

[12] Before and during trial, trial counsel questioned the admissibility of the evidence seized pursuant to the search warrant, challenged the validity of the search warrant itself, and alleged that the seizure of the items found near the tree line was unreasonable. Warren did not present any evidence to the PCR court to demonstrate that subsequent objections to the same evidence, supported by the similar reasoning would have been successful. Counsel is not rendered inadequate for failing to make a futile objection. *Curtis v. State*, 905 N.E.2d 410, 418 (Ind. Ct. App. 2009). Moreover, "[c]ounsel cannot be faulted for failing to make an objection which had no hope of success and which might have the adverse effect before the jury of emphasizing the admissibility of [the evidence]." *Id.* (quoting *Garrett v. State,* 602 N.E.2d 139, 141 (Ind. 1992)).

[13] Furthermore, trial counsel proceeded through trial with a reasonable strategy that took advantage of the State's evidence. Trial counsel attempted to blame Marty and Audrey for the methamphetamine evidence and show that Warren was simply an innocent bystander. Additionally, trial counsel stressed the fact that the State had no evidence of a methamphetamine lab or any actual methamphetamine. "There are countless ways to provide effective assistance in

any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Explaining, rather than continuing to object to, the State's evidence was a strategy which was within trial counsel's professional judgment. We, therefore, conclude that Warren has failed to show deficient performance of trial counsel.

[14] Affirmed.

[15] Najam, J., and Barnes, J., concur.